**No. 26-1886**

In the United States Court of Appeals
for the Eighth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

TIM WALZ, *ET AL.*,
*Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Minnesota, Case No. 0:25-cv-02668

# BRIEF OF AMICI CURIAE NATIONAL EDUCATION ASSOCIATION AND EDUCATION MINNESOTA IN SUPPORT OF DEFENDANTS-APPELLEES AND URGING AFFIRMANCE


Alice O'Brien
Katherine E. Lamm
Lubna A. Alam
Stacy Hickox
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7067
klamm@nea.org

*Counsel for Amici Curiae*


Appellate Case: 26-1886 Page: 1 Date Filed: 09/02/2026 Entry ID: 5679233

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(4)(a), Amici Curiae National Education Association (NEA) and Education Minnesota (EdMN) state that they are nonprofit corporations. Amici further state that they are not subsidiaries of any corporation, nor do they have any stock that can be owned or held by a publicly held corporation.

# TABLE OF CONTENTS


TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF AMICI CURIAE ....................................................... 1

INTRODUCTION ............................................................................... 4

ARGUMENT ....................................................................................... 8

I. Many states, including Minnesota, equalized access to in-state tuition for undocumented students against the backdrop of PRWORA and IIRIRA. ............................................................. 9

a. Undocumented students are a small but integral part of school communities. ........................................................................ 10

b. Lawmakers have long sought to sensibly address the plight and potential of undocumented students. ......................................... 13

II. Minnesota's tuition equity laws satisfy Congress's limitations on postsecondary education benefits and serve its goal of promoting immigrants' self-sufficiency. ......................................................... 17

a. Section 1623 does not categorically prohibit undocumented students from accessing in-state tuition or financial assistance for postsecondary education. ....................................................... 18

b. Minnesota's tuition equity laws validly promote immigrants' self-sufficiency. .................................................................................. 20

i. Tuition equity at postsecondary educational institutions promotes students' enrollment and success. ............................ 21

ii. Higher education improves financial and wellbeing outcomes. ....................................................................................... 25

III. Minnesota's tuition equity laws are an exercise of traditional state authority that supports the State's public education system, workforce, and economy. ............................................................... 27

a. Construing Section 1623 to preempt Minnesota's tuition equity laws would intrude on the State's control of its education function. .......................................................................................... 28

b. Tuition equity is an investment in the State's education system… 30

c. Tuition equity is an investment in the State's workforce and economy. 33

CONCLUSION 37

CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION AND TYPEFACE AND TYPESTYLE REQUIREMENTS

CERTIFICATE OF COMPLIANCE WITH EIGHTH CIRCUIT RULE 28A(H)

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### Cases

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) .......... 6, 17

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) .......... 28, 29

*Cook Cnty, Ill. v. Wolf*, 962 F.3d 208 (7th Cir. 2020) .......... 19

*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) .......... 6

*Martinez v. Regents of the Univ. of Calif.*, 50 Cal. 4th 1277 (Cal. 2010) 14

*Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255 (4th Cir. 2005) .......... 29

*R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170 (8th Cir. 2023) .......... 7, 28

*Texas v. United States*, 126 F.4th 392 (5th Cir. 2025) .......... 11

*United States v. Texas*, 181 F.4th 548 (5th Cir. 2026) .......... 14, 18

### Statutes

8 U.S.C. § 1254a(a)(1)(B) .......... 10

8 U.S.C. § 1254a(a)(2) .......... 10

8 U.S.C. § 1601 .......... 17, 19

8 U.S.C. § 1601(1)–(2) .......... 4, 19, 21

8 U.S.C. § 1601, *et seq* .......... 4

8 U.S.C. § 1621(a) .......... 4, 19

8 U.S.C. § 1621(c) .......... 4

8 U.S.C. § 1621(d) .......... 5, 19

8 U.S.C. § 1623 .......... passim

Cal. Educ. Code § 68130.5 .......... 14

Minn. Stat. § 135A.011 .......... 29

Minn. Stat. § 135A.012 .......... 29, 32

Minn. Stat. § 135A.043 ........ 5, 15, 16, 20

Minn. Stat. § 136A.101, subd. 8(9) ........ 16

Minn. Stat. § 136A.1241 ........ 16

Minn. Stat. § 136A.1465 ........ 5, 16, 20

Minn. Stat. § 197.75 ........ 16

Tex. Educ. Code § 54.052–053 ........ 14

**U.S. Constitution**

U.S. Const. art. VI, cl.2 ........ 6

**Legislative Materials**

2013 Minn. Laws, ch. 99, art. 4, § 1 ........ 15

2023 Minn. Laws, ch. 41, art. 2, § 19 ........ 16

2025 Minn. Laws, ch. 5, art. 2, § 61 ........ 16

H.F. 10, 94th Leg., Reg. Sess. (Minn. 2025) ........ 16

H.R. Rep. No. 104-828, at 240 (1996) ........ 18

S. 1291, 107th Cong. (2001) ........ 13

S.F. 690, 94th Leg., Reg. Sess. (Minn. 2025) ........ 16

**Executive Materials**

Exec. Order 14,218 ("Ending Taxpayer Subsidization of Open Borders"), 90 Fed. Reg. 10,581 (Feb. 25, 2025) ........ 5

Exec. Order 14,287 ("Protecting American Communities From Criminal Aliens"), 90 Fed. Reg. 18,761 (May 2, 2025) ........ 5

**Regulations**

8 C.F.R. § 236.23(a)(4) ........ 11

8 C.F.R. § 274a.12(c)(33) ........ 11

**Rules**

Fed. R. App. P. 29(a)(2) ........ 1

Fed. R. App. P. 29(a)(4)(E) ........ 1

**Other Authorities**


Alex Friedrich, *Minnesota Senate passes Dream Act legislation*, MPR News (May 1, 2013) ........ passim

American Immigration Council, *The Dream Act: An Overview* (May 8, 2024)........ 14

Amy Nunez & Gretchen Holthaus, *In-State Tuition for Undocumented Students: A Policy Analysis*, 2017 J. of the Student Pers. Ass'n at Ind. Univ. 47........ 22, 25, 31, 34

Brian Freeman & Sandra Wilson, *College Affordability Views and College Enrollment*, U.S. Dep't of Educ., Inst. for Educ. Scis. (Jan. 2022)........ 24

Bureau of Labor Statistics, *Education Pays* (2024)........ 25, 26

Catalina Amuedo-Dorantes & Chad Sparber, *In-State Tuition for Undocumented Immigrants and its Impact on College Enrollment, Tuition Costs, Student Financial Aid, and Indebtedness*, 49 Reg'l Sci. & Urb. Econ. 11 (Sept. 2014)........ 23, 32

Christian Penichet-Paul, *Eliminating Barriers to a Higher Education for Undocumented Students Is an Urgent Need*, EdTrust (Feb. 2023) ........ 23

Deborah Son Holoien, *Do Differences Make a Difference? The Effects of Diversity on Learning, Intergroup Outcomes, and Civic Engagement* (Sept. 2013)........ 33

Education Minnesota, *Statements of Principle* (April 27, 2025) ........ 3

Education Minnesota, *Who We Are*........ 3

Erica Williams, et al., *Inclusive Approach to Immigrants Who Are Undocumented Can Help Families and States Prosper*, Ctr. on Budget & Pol'y Priorities (Dec. 19, 2019) ........ 34, 36

Erin Dunlop Velez & Laura Horn, *What High Schoolers and Their Parents Know About Public 4-Year Tuition and Fees in Their State*, U.S. Dep't of Educ., Inst. of Educ. Scis. (Oct. 2018) ........ 23

Higher Ed Immigr. Portal, *Portal to the States*........ 15

Jeanne Batalova, *Graduating into Uncertainty: Unauthorized Immigrant Students in U.S. High Schools*, Migration Pol'y Inst. (Feb. 2026) .......... 2, 12

Jonathan Zabala, *Diversifying the U.S. Teaching Force: Pathways for Undocumented Teachers*, The Century Found. (Oct. 18, 2023) .......... 35

Julia Gelatt, et al., *Changing Origins, Rising Numbers: Unauthorized Immigrants in the United States*, Migration Pol'y Inst. (Oct. 2025) .......... 10, 11

Katherine W. Phillips, *How Diversity Works*, 311 Sci. Am. 42 (Oct. 2014) .......... 33

Kristina Rogan, *Defining Residency: In-State Tuition Implications for United States Citizens Who Are Children of Undocumented Immigrant Parents*, 41 Seton Hall Leg. J. 177 (2017) .......... 14

Leslie Villegas & Madeleine Rodriguez, *The Push to Make College (More) Unaffordable for Undocumented Students*, New Am. (Oct. 31, 2025) .......... 22

Lisa Dickson, et al., *The Education and Employment Effects of DACA, In-State Tuition, and Financial Aid for Undocumented Students* (Inst. of Lab. Econ., IZA Discussion Paper No. 11109, 2017) .......... 32

Matea Pender, et al., *Education Pays 2026: The Benefits of Higher Education for Individuals and Society*, Coll. Bd. (2026) .......... 26, 27

Megan Brenan, *American's Support for Immigration Down, Still Strong*, Gallup (July 9, 2026) .......... 13

Melanie Hanson, *Average In-State vs. Out-of-State Tuition*, Educ. Data Initiative (July 5, 2026) .......... 22

Migration Pol'y Inst., *Profile of the Unauthorized Population: Minnesota* .......... 12

Migration Pol'y Inst., *Profile of the Unauthorized Population: United States* .......... 12

Minn. House of Rep., *Legislative News and Views – Rep. Carlos Mariani (DFL): Minnesota DREAM Act Set to be Signed Into Law* (May 18, 2013) .......... 21, 30

Minn. Professional Educator Licensing & Standards Bd., *2023 Biennial Report: Supply & Demand of Teachers in Minnesota*..........................34

Minn. Professional Educator Licensing & Standards Bd., *The 2025 Supply & Demand of Teachers in Minnesota: a Biennial Report*........35

Minnesota Office of Higher Education, *Student Enrollment Data*........12

Monmouth Univ., *Opinion is split on Trump proposal, most continue to oppose border wall* (Feb. 5, 2018)......................................................13

Nadra Nittle, *She's devoted her life to teaching your kids — in a country that now wants to deport her*, The 19th (May 8, 2025)........................23

Nat'l Educ. Ass'n, *Our Mission, Vision, & Values* (2006).........................1

Nat'l Immigr. L. Ctr, *Basic Facts About In-State Tuition for Undocumented Immigrant Students* (June 2, 2026)............................32

Neeraj Kaushal, *In-State Tuition for the Undocumented: Education Effects on Mexican Young Adults*, 27 J. of Pol'y Analysis & Mgmt. 771 (2008) ..........................................................................................32

Noah Berger & Peter Fisher, *A Well-Educated Workforce Is Key to State Prosperity*, Econ. Pol'y Inst. (Aug. 22, 2013).......................................36

Patricia Gurin, et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330 (2002)....33

Rajeev Darolia & Stepanie Potochnick, *Educational "When," "Where," and "How" Implications of In-State Resident Tuition Policies for Latino Undocumented Immigrants*, 38 Rev. of Higher Educ. 507 (2015) ....................................................................................24, 31

Robert Bozick & Trey Miller, *In-State College Tuition Policies for Undocumented Immigrants: Implications for High School Enrollment Among Non-Citizen Mexican Youth*, 33 Population Rsch. & Pol'y Rev. 13 (2014) .......................................................................25-26, 31

Robert Bozick, et al., *Non-citizen Mexican Youth in US Higher Education: A Closer Look at the Relationship Between State Tuition Policies and College Enrollment*, 50 Int'l Migration Rev. 864 (2016) ..........................................................................................23

Stella M. Flores, *State Dream Acts: The Effect of In-State Resident Tuition Polices and Undocumented Latino Students*, 33 Rev. of Higher Educ. 239 (2010) ........................................................................23

Stephanie Potochnick, *How States Can Reduce the Dropout Rate for Undocumented Immigrant Youth: The Effects of In-State Resident Tuition Policies*, 45 Soc. Sci. Rsch. 12 (May 2014)........................26, 31

Stephen Nelson, et al., *Administrative Dream Acts and Piecemeal Policymaking: Examining State Higher Education Governing Board Policies Regarding In-State Tuition for Undocumented Immigrant Students*, 28 Geo. Immigr. L. J. 555 (2014) ..................................13, 14

Tiffany Tan, et al., *State Teacher Shortages 2026 Update*, Learning Pol'y Inst. (July 6, 2026)..............................................................11, 35

U.S. Census Bureau, *Minnesota* ........................................................22

Wil del Pilar, *Crushed Dreams and Broken Promises, Supreme Court Edition*, EdTrust (July 2, 2020) ........................................................24

## STATEMENT OF AMICI CURIAE

NEA and EdMN have a strong interest in this appeal, which involves access to higher education for students who immigrated to the United States without authorization (sometimes referred to as "undocumented" students).[1] Founded in 1857, NEA is the oldest and largest educational association in the country. NEA represents nearly three million educators, including teachers, counselors, nurses, and education support professionals nationwide. NEA's membership also includes thousands of aspiring educators who are enrolled in higher education on a path to teaching careers. NEA's mission is to "advocate for education professionals" and to work collectively to "fulfill the promise of public education to prepare every student to succeed in a diverse and interdependent world."[2]

---

[1] Amici submit this brief with the parties' consent. Fed. R. App. P. 29(a)(2). No party's counsel authored the brief in any part or contributed money intended to fund the brief's preparation or submission, and no person—other than amici, their members, or counsel—contributed money intended to fund the brief's preparation or submission. *Id.* 29(a)(4)(E).

[2] Nat'l Educ. Ass'n, *Our Mission, Vision, & Values* (2006), https://www.nea.org/about-nea/mission-vision-values.

This mission encompasses supporting immigrants in education, including those who are undocumented. Many NEA members are immigrants. Some of these members are undocumented but have received temporary relief and work authorization through programs such as Deferred Action for Childhood Arrivals (DACA) or Temporary Protected Status (TPS), and others have obtained permanent lawful status. NEA members also serve the hundreds of thousands of students in the United States who are undocumented—including those with DACA and TPS—approximately 90,000 of whom complete high school annually.[3] NEA supports these students' access to higher education, including through "tuition equity" measures that allow them to obtain in-state tuition and financial aid like their documented and U.S. citizen peers.

EdMN is an affiliate of NEA, the American Federation of Teachers, and the AFL-CIO. EdMN represents nearly 85,000 members working in Minnesota's pre-K–12 schools and higher education institutions, as well

[3] Jeanne Batalova, *Graduating into Uncertainty: Unauthorized Immigrant Students in U.S. High Schools*, Migration Pol'y Inst. 1 (Feb. 2026), https://www.migrationpolicy.org/sites/default/files/publications/mpi-unauthorized-hs-grads-fact-sheet-2026-final.pdf.

as aspiring educators. As the “leading advocate for public education in Minnesota,”[4] EdMN champions the “welfare of each [EdMN] member” and the “successful development of each learner,” including “access to affordable life-long education.”[5] EdMN is committed to supporting the immigrants among its members and their school communities.

---

[4] Education Minnesota, *Who We Are*, https://educationminnesota.org/about-us/who-we-are (last visited Sept. 1, 2026).

[5] Education Minnesota, *Statements of Principle* (April 27, 2025), https://educationminnesota.org/wp-content/uploads/2025/03/2025_StatementsofPrinciple.pdf.

**INTRODUCTION**

This case is about whether a federal statute limiting states' ability to offer higher-education benefits to undocumented immigrants preempts Minnesota laws that allow some undocumented graduates of Minnesota high schools to access in-state tuition and financial assistance at public colleges and universities.

Two 1996 laws relating to "welfare and immigration" are relevant here: the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). *See* 8 U.S.C. § 1601, *et seq*. These laws embody a national immigration policy rooted in the principle of "self-sufficiency," in which immigrants "rely on their own capabilities" and public benefits do not encourage unauthorized immigration. *Id.* § 1601(1)–(2).

In PRWORA, Congress restricted eligibility for "State or local public benefits," including postsecondary education benefits, to "qualified" non-citizens, exclusive of undocumented immigrants. 8 U.S.C. § 1621(a), (c). Congress nevertheless permitted a State to extend benefits to people who are "not lawfully present"—the undocumented,

even if they have DACA or TPS—"through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility." *Id.* § 1621(d). A provision of IIRIRA, however, provides that a person who is not lawfully present "shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit . . . without regard to whether the citizen or national is such a resident." *Id.* § 1623.

Almost thirty years later, in early 2025, President Trump signed two executive orders that directed agency heads to enforce compliance with PRWORA and IIRIRA. *See* Exec. Order 14,218 ("Ending Taxpayer Subsidization of Open Borders"), 90 Fed. Reg. 10,581 (Feb. 25, 2025); Exec. Order 14,287 ("Protecting American Communities From Criminal Aliens"), 90 Fed. Reg. 18,761 (May 2, 2025). In June 2025, the United States sued Minnesota and Minnesota officials over two state laws, the Minnesota Prosperity (or "Dream") Act and the North Star Promise, Minn. Stat. §§ 135A.043, 136A.1465, which allow students who graduate from high schools in Minnesota after at least three years' attendance—including certain undocumented students—to access in-state tuition and financial assistance at public colleges and universities. *See* App.29–43;

R.Doc.1. The complaint alleged that Section 1623 preempts these laws, on the theory that they violate the Supremacy Clause's designation of federal law as "the supreme Law of the Land," U.S. Const. art. VI, cl.2. App.42; R.Doc.1, at 14.

The district court properly granted the State defendants' motion to dismiss, concluding that Section 1623 does not preempt the Minnesota statutes. Add.4; App.4; R.Doc.42, at 4. Relevant here, the court observed that Congress's "purpose" is the "ultimate touchstone" of the preemption inquiry, which "guide[s]" the assessment of a federal law's preemptive scope. Add.13; App.13; R.Doc.42, at 13 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)). The focus of this analysis, of course, is the "plain wording" of an express preemption clause, which is the "best evidence of Congress's preemptive intent." Add.13–14; App.13–14; R.Doc.42, at 13–14 (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). Another guiding principle the district court acknowledged—but found unnecessary to analyze—is the presumption that federal law does not intrude upon traditional state functions (here, the "police power over education") absent heightened clarity of Congress's intent. Add.14 n.8;

App.14 n.8; R.Doc.42, at 14 n.8 (citing *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023)).

As relevant here, the district court held that the Minnesota statutes did not trigger Section 1623's requirements for preemption because they (1) "determine[] eligibility based on residency-neutral criteria, specifically, where a student graduated high school," and (2) make eligible certain citizens or nationals regardless of residency (*e.g.*, non-residents who attend a Minnesota boarding, private, or public school). Add.16, 17–24; App.16, 17–24; R.Doc.42, at 16, 17–24. Accordingly, the district court dismissed the complaint without reaching the heightened clarity needed for preemption of historic police powers or the State defendants' separate argument that a more expansive view of Section 1623's preemptive scope would violate the Tenth Amendment's anticommandeering mandate. *See* Add.14 n.8, 25 n.13; App.14 n.8, 25 n.13; R.Doc.42, at 14 n.8, 25 n.13.

NEA and EdMN submit this brief to provide background relating to the enactment of Minnesota's tuition equity laws and further support for the district court's conclusion that they are not within the universe of state benefits that Congress chose to prohibit.

## ARGUMENT

The district court correctly concluded that Section 1623 does not preempt the Minnesota Prosperity Act or the North Star Promise. As the district court held, Minnesota's tuition equity statutes *do not do* what Congress prohibited in Section 1623: granting a higher education benefit to undocumented students "on the basis of residence in a State" while excluding non-resident U.S. citizens or nationals from the same benefit. Rather, eligibility hinges on attending three years of high school in Minnesota and graduating, regardless of residency—continuing the State's investment in the students that its schools already have educated, and in the State's education system, workforce, and economy.

First, the context in which Minnesota adopted its tuition equity laws is consistent with federal law compliance, not preemption. Like other states, Minnesota enacted its laws against the backdrop of PRWORA and IIRIRA's limitations, and these state laws' longstanding operation is harmonious with the federal statutes' requirements and goals.

Second, this Court should reject the United States' attempt to rewrite Section 1623 as a categorical prohibition on undocumented

students' receipt of in-state tuition. Section 1623 does no such thing; rather, it contains a discrete limitation that aligns with Congress's goals of disincentivizing unlawful migration while also promoting immigrants' self-sufficiency and reliance on their own resources. Minnesota's tuition equity laws comply with Congress's express limitations while enabling undocumented students to lead productive lives.

Finally, Minnesota's tuition equity laws are an exercise of traditional state authority over education that Section 1623 should not be misconstrued to preempt. Tuition equity is an investment in the State's education system, workforce, and economy by facilitating more students' academic achievement in Minnesota.

These reasons, among others, support affirmance.

## I. Many states, including Minnesota, equalized access to in-state tuition for undocumented students against the backdrop of PRWORA and IIRIRA.

The context and history behind the adoption of state tuition equity laws demonstrates responsiveness to both the reality of undocumented students' presence within communities and to Congress's limitation of postsecondary education benefits in Section 1623—not defiance.

**a. Undocumented students are a small but integral part of school communities.**

Presently, over 13 million people who immigrated without authorization are estimated to live in the United States.[6] Despite lacking proper documentation, these immigrants are part of the fabric of American communities. The vast majority of the undocumented immigrant population has lived in the country for at least five years and nearly half for more than 20 years.[7] Many—nearly 30 percent—formally sought and received the government's temporary forbearance from removal pursuant to programs like TPS and DACA.[8] Importantly, these programs provide authorization to work in the United States or the ability to obtain authorization. *See* 8 U.S.C. § 1254a(a)(1)(B), (a)(2) (providing work authorization for TPS recipients); 8 C.F.R. §§

---

[6] Julia Gelatt, et al., *Changing Origins, Rising Numbers: Unauthorized Immigrants in the United States*, Migration Pol'y Inst. 1 (Oct. 2025), https://www.migrationpolicy.org/sites/default/files/publications/mpi-unauthorized-immigrants-fact-sheet-2025_FINAL.pdf. The Migration Policy Institute's October 2025 estimate of 13.7 million unauthorized immigrants relies on mid-2023 data. *Ibid.*

[7] *Ibid.*

[8] *Ibid.*

236.23(a)(4), 274a.12(c)(33) (enabling DACA recipients to seek work authorization).[9]

Undocumented immigrants are an important part of the workforce, including the education workforce. Most working-aged undocumented immigrants have jobs, more than 200,000 of which are in elementary and secondary schools.[10] This figure is significant, as there is a shortage of qualified educators in the United States: as of July 2026, more than 425,000 teaching positions are either unfilled or filled by teachers not fully certified for their assignments, representing one in eight of all teaching positions.[11]

Undocumented children comprise a small but significant portion of the K–12 student population. Most of the country's approximately one million undocumented school-aged children (ages 5 to 18) are enrolled in

---

[9] There is ongoing litigation over the DACA rule, *Texas v. United States*, 1:18-cv-00068 (S.D. Tex.), following a Fifth Circuit decision affirming the rule's vacatur as to Texas only, *Texas v. United States*, 126 F.4th 392, 420–21 (5th Cir. 2025).

[10] Gelatt, et al., *supra* note 6, at 6.

[11] Tiffany Tan, et al., *State Teacher Shortages 2026 Update*, Learning Pol'y Inst. (July 6, 2026), https://learningpolicyinstitute.org/product/state-teacher-shortages-vacancy-resource-tool-2026.

school.[12] Around 90,000 of these children finish school each year, with 75,000 receiving high school diplomas.[13]

In Minnesota, there are about 6,000 undocumented school-aged children, around 93% of whom are enrolled.[14] These students go on to become a small portion of the postsecondary student population. At the time of the Prosperity Act's passage, the total number of students expected to newly qualify for in-state tuition was 750.[15] Although there are over 300,000 students enrolled in postsecondary education in Minnesota presently,[16] only around 3,000 undocumented college-aged adults (ages 19 to 24) are enrolled.[17]

---

[12] Migration Pol'y Inst., *Profile of the Unauthorized Population: United States*, https://www.migrationpolicy.org/data-tool/unauthorized-immigrants/us#education_and_language (last visited Sept. 1, 2026).

[13] Batalova, *supra* note 3, at 1.

[14] Migration Pol'y Inst., *Profile of the Unauthorized Population: Minnesota*, https://www.migrationpolicy.org/data-tool/unauthorized-immigrants/mn (last visited Sept. 1, 2026).

[15] Alex Friedrich, *Minnesota Senate passes Dream Act legislation*, MPR News (May 1, 2013), https://www.mprnews.org/story/2013/05/01/senate-dream-act.

[16] Minn. Office of Higher Education, *Student Enrollment Data*, https://ohe.mn.gov/reports/student-enrollment-data (last visited Sept. 1, 2026).

[17] Migration Pol'y Inst., *Profile of the Unauthorized Population: Minnesota*, *supra* note 14.

**b. Lawmakers have long sought to sensibly address the plight and potential of undocumented students.**

There is longstanding public awareness of and official concern for the situation of undocumented children,[18] who are excluded from many public programs, including under the relevant parts of PRWORA and IIRIRA. A bipartisan duo of U.S. Senators first introduced the Development, Relief, and Education for Alien Minors (DREAM) Act in 2001, which would have created a pathway to citizenship for undocumented youth and eliminated IIRIRA's limitations on residency-based tuition. S. 1291, 107th Cong. (2001). But the DREAM Act failed

[18] *See, e.g.*, Stephen Nelson, et al., *Administrative Dream Acts and Piecemeal Policymaking: Examining State Higher Education Governing Board Policies Regarding In-State Tuition for Undocumented Immigrant Students*, 28 Geo. Immigr. L. J. 555, 557–58, 565–71 (2014) (describing official efforts to address undocumented students' concerns); Monmouth Univ., *Opinion is split on Trump proposal, most continue to oppose border wall* (Feb. 5, 2018), https://www.monmouth.edu/polling-institute/reports/monmouthpoll_us_020518 (showing that in 2018, nearly 75% of Americans supported a pathway to citizenship for immigrants brought to the United States unlawfully as children); Megan Brenan, *American's Support for Immigration Down, Still Strong*, Gallup (July 9, 2026), https://news.gallup.com/poll/712289/americans-support-immigration-down-strong.aspx (showing that 81% of Americans supported a pathway to citizenship in 2026).

then and stalled in later reintroductions, despite substantial bipartisan support in both houses of Congress.[19]

Against the backdrop of PRWORA, IIRIRA, and the DREAM Act's failure, many states—"red" and "blue" alike—began adopting measures that enable undocumented students to access in-state tuition alongside their classmates with lawful status.[20] The first two states to do so, in 2001, were Texas and California, which passed laws that permitted certain graduates of the states' high schools to pay in-state tuition. *See* Tex. Educ. Code §§ 54.052–053; Cal. Educ. Code § 68130.5.[21] Over time, 24 states and the District of Columbia extended in-state tuition to

---

[19] *See* American Immigration Council, *The Dream Act: An Overview* (May 8, 2024), https://www.americanimmigrationcouncil.org/fact-sheet/dream-act-overview; Nelson, et al., *supra* note 18, at 567–68.

[20] *See* Nelson, et al., *supra* note 18, at 569–79; Kristina Rogan, *Defining Residency: In-State Tuition Implications for United States Citizens Who Are Children of Undocumented Immigrant Parents*, 41 Seton Hall Leg. J. 177, 186–91 (2017).

[21] In an appeal from the entry of a consent decree between the U.S. Department of Justice and Texas, the Fifth Circuit recently held that Section 1623 validly preempts Texas's law. *United States v. Texas*, 181 F.4th 548 (5th Cir. 2026). The Justice Department has sued to invalidate California's tuition equity law. *United States v. Newsom*, No. 2:25-cv-03375 (E.D. Cal.). Notably, the California Supreme Court previously rejected private claims that Section 1623 preempts California's law. *Martinez v. Regents of the Univ. of Calif.*, 50 Cal. 4th 1277 (Cal. 2010).

undocumented students in some fashion.[22] These measures remained on the books—undisturbed by federal government challenges—over the course of two decades. Since early 2025 and the executive orders on PRWORA and IIRIRA, however, the number of states with tuition equity has dropped to 20 (as of this writing).[23]

Minnesota's story tracks this arc. In 2013, the Minnesota legislature passed the Prosperity Act, which extends in-state tuition to graduates of Minnesota high schools, including undocumented students who meet certain requirements. 2013 Minn. Laws, ch. 99, art. 4, § 1, codified at Minn. Stat. § 135A.043. Specifically, a student may pay "resident tuition" at Minnesota's postsecondary institutions if the student: (1) attended a high school in Minnesota for at least three years, (2) graduated high school or obtained an equivalent degree in Minnesota, and, (3) if "without lawful immigration status," the student has met selective service registration requirements and applied for lawful

---

[22] Higher Ed Immigr. Portal, *Portal to the States,* https://www.higheredimmigrationportal.org/states (last visited Sept. 1, 2026).

[23] *Ibid.*

immigration status if possible. Minn. Stat. § 135A.043.[24] Lawmakers from both of Minnesota's major political parties supported the law insofar as it equalized access to in-state tuition and certain privately funded university scholarships.[25]

A decade later, the legislature passed the North Star Promise. This scholarship program provides free tuition at Minnesota's colleges and universities to certain students with family incomes under $80,000, including those who qualify for "resident tuition." 2023 Minn. Laws, ch. 41, art. 2, § 19, codified at Minn. Stat. § 136A.1465.

Neither the Prosperity Act nor the North Star Promise generated a preemption-based challenge until the Justice Department brought this lawsuit in 2025. Although some legislators proposed retracting the North Star Promise's applicability to undocumented students in 2025, this failed. *See* H.F. 10, 94th Leg., Reg. Sess. (Minn. 2025); S.F. 690, 94th Leg., Reg. Sess. (Minn. 2025).

---

[24] Eligibility for "resident tuition" also enables students to access certain other financial aid programs. *See* Minn. Stat. §§ 136A.101, subd. 8(9); 136A.1241; 197.75; 2025 Minn. Laws, ch. 5, art. 2, § 61.

[25] Friedrich, *supra* note 15.

Thus, Minnesota's program of tuition equity has remained in place for more than a decade, without legal challenge or alteration by the legislature, disrupted only by the Justice Department's sudden invocation of the federal government's preemptive theory.

## II. Minnesota's tuition equity laws satisfy Congress's limitations on postsecondary education benefits and serve its goal of promoting immigrants' self-sufficiency.

In this Court, the United States presses an insupportably broad position: that federal law wholly "preempt[s] state laws providing in-state tuition to unlawfully present aliens." *See, e.g.*, Br. 1–2. But Section 1623's language is more limited, consistent with the purposes specified in Congress's enactments relating to "welfare and immigration," 8 U.S.C. § 1601, PRWORA and IIRIRA. Indeed, Congress's purpose is the "ultimate touchstone" of the preemption analysis. *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).

As discussed below, Minnesota's tuition equity laws not only comply with Section 1623's defined limitation on postsecondary education benefits but also serve Congress's aim of enhancing immigrants' self-sufficiency and ability to rely on their own resources.

**a. Section 1623 does not categorically prohibit undocumented students from accessing in-state tuition or financial assistance for postsecondary education.**

Section 1623 plainly does not prohibit all state laws extending in-state tuition to undocumented students. Although the United States claims that this is "self-evidently what the statute is about," the best support it offers for this contention is legislative history stating that Section 1623 "provides that illegal aliens are not eligible for in-state tuition rates." *See* Br. 14–15 (quoting H.R. Rep. No. 104-828, at 240 (1996)). While Congress could have written such a statute, it did not. Instead, it provided that undocumented students "shall not be eligible *on the basis of residence within a State*" for postsecondary education benefits. 8 U.S.C. § 1623 (emphasis added). As the Fifth Circuit recently explained, this language makes Section 1623's preemptive force hinge on whether state residency is a "but-for" cause of an undocumented student's eligibility for a postsecondary education benefit, *see United States v. Texas*, 181 F.4th 548, 555–57 (5th Cir. 2026)—not whether the benefit *is* in-state tuition.

Further, Congress narrowed Section 1623's restriction on residency-based postsecondary education benefits for undocumented

students with a caveat: ". . . unless a citizen or national of the United States is eligible for such a benefit" regardless of their state residency. 8 U.S.C. § 1623. This parity-oriented exception underscores Congress's choice to stop short of the blanket prohibition that the United States now urges. Indeed, a similar approach appears in Congress's related enactment in Section 1621 in PRWORA, which generally limits undocumented immigrants' access to state and local programs and benefits *unless* the state extends them in a particular way: through a law enacted after PRWORA was signed into law. 8 U.S.C. § 1621(a), (d); *see Cook Cnty, Ill. v. Wolf*, 962 F.3d 208, 225 (7th Cir. 2020) (explaining that PRWORA's "exclusions," including in Section 1621, "are not absolute").

Congress's choice to limit, but not categorically forbid, undocumented individuals' benefits eligibility is consistent with its multifaceted policy in the area of "welfare and immigration," 8 U.S.C. § 1601. That policy is not simply to prohibit access to public benefits. Instead, it is to encourage immigrants' "self-sufficiency" and "rel[iance] on their own capabilities," and to ensure that "public benefits not constitute an incentive" for unauthorized immigration. 8 U.S.C § 1601(1)–(2). To achieve these multiple aims, Congress enacted limits on

benefits eligibility but also left states to offer their own resources to undocumented immigrants in a prescribed manner.

As discussed below, permitting states to extend benefits and programs through PRWORA- and IIRIRA-compliant measures—like Minnesota's tuition equity laws—enables states to promote immigrants' self-sufficiency as well as their own sovereign interests in a thriving education system and economy.

**b. Minnesota's tuition equity laws validly promote immigrants' self-sufficiency.**

Minnesota's tuition equity laws avoid IIRIRA's prohibition on extending postsecondary education benefits based on residency while serving Congress's policy of promoting immigrants' self-sufficiency. As the district court correctly held, Section 135A.043 is not preempted because it conditions eligibility for in-state tuition (which triggers eligibility for the North Star Promise, Section 136A.1465) on the "residency-neutral criteria" of where a student attended high school, necessarily sweeping in U.S. citizens and nationals regardless of residency. Add.16, 17–24; App.16, 17–24; R.Doc.42, at 16, 17–24 (citing, *inter alia*, Minn. Stat. § 135A.043).

In so doing, Minnesota's legislature made it easier for students who were educated in Minnesota, including those who are undocumented, to go on to higher education. Indeed, lawmakers behind the law in both of Minnesota's legislative bodies emphasized that it would enhance the ability of *all* graduates in Minnesota to go on to higher education and to become productive community members.[26] As detailed below, higher education is associated with a number of positive outcomes—better earnings, personal wellbeing, stability—that promote some of the very goals that Congress articulated in enacting PRWORA and IIRIRA: enhancing immigrants' self-sufficiency and reliance on their own resources. *See* 8 U.S.C. § 1601(1)–(2). Minnesota's tuition equity laws thus operate in harmony with the federal regime.

**i. Tuition equity at postsecondary educational institutions promotes students' enrollment and success.**

There can be little doubt that offering in-state tuition and financial assistance makes higher education significantly more affordable and

[26] Friedrich, *supra* note 15; Minn. House of Rep., *Legislative News and Views – Rep. Carlos Mariani (DFL): Minnesota DREAM Act Set to be Signed Into Law* (May 18, 2013), https://www.house.mn.gov/members/profile/news/10399/7670.

accessible. The average out-of-state tuition cost for students at four-year public colleges and universities in Minnesota was $26,719 in 2025, whereas the average in-state tuition cost was $12,873.[27] The nearly $14,000 difference in price is meaningful, representing about 16 percent of the median annual household income of $87,117 in Minnesota.[28]

This is even more significant for undocumented students because "many . . . come from low socioeconomic backgrounds," and money is often a barrier to attendance.[29] Moreover, undocumented students generally are ineligible for government-sponsored financial aid.[30] Absent states' efforts to ease financial burdens, college may be beyond these students' reach.[31] As one NEA member and DACA recipient in California has

---

[27] Melanie Hanson, *Average In-State vs. Out-of-State Tuition*, Educ. Data Initiative (July 5, 2026), https://educationdata.org/average-in-state-vs-out-of-state-tuition.

[28] U.S. Census Bureau, *Minnesota*, https://data.census.gov/profile/Minnesota?g=040XX00US27 (last visited Sept. 1, 2026).

[29] Amy Nunez & Gretchen Holthaus, *In-State Tuition for Undocumented Students: A Policy Analysis*, 2017 J. of the Student Pers. Ass'n at Ind. Univ. 47, 47–48.

[30] *Ibid.*

[31] *See* Leslie Villegas & Madeleine Rodriguez, *The Push to Make College (More) Unaffordable for Undocumented Students*, New Am. (Oct. 31, 2025), https://www.newamerica.org/insights/the-push-to-make-college-more-unaffordable-for-undocumented-students.

explained, eligibility for in-state tuition *and* state financial assistance—similar to Minnesota's program of tuition equity—enabled her to start her education at an affordable community college and then transfer to a prestigious, four-year state university.[32]

Research has shown that access to in-state tuition increases the likelihood or incidence of undocumented students' enrollment in higher education.[33] The perception of college affordability has been shown to impact the likelihood that students plan to attend college[34] and that they

[32] Nadra Nittle, *She's devoted her life to teaching your kids — in a country that now wants to deport her*, The 19th (May 8, 2025), https://19thnews.org/2025/05/undocumented-educators-teachers-america.

[33] Christian Penichet-Paul, *Eliminating Barriers to a Higher Education for Undocumented Students Is an Urgent Need*, EdTrust (Feb. 2023), https://edtrust.org/blog/eliminating-barriers-to-a-higher-education-for-undocumented-students-is-an-urgent-need; Catalina Amuedo-Dorantes & Chad Sparber, *In-State Tuition for Undocumented Immigrants and its Impact on College Enrollment, Tuition Costs, Student Financial Aid, and Indebtedness*, 49 Reg'l Sci. & Urb. Econ. 11, 14 (Sept. 2014); Robert Bozick, et al., *Non-citizen Mexican Youth in US Higher Education: A Closer Look at the Relationship Between State Tuition Policies and College Enrollment*, 50 Int'l Migration Rev. 864, 879–880 (2016); Stella M. Flores, *State Dream Acts: The Effect of In-State Resident Tuition Polices and Undocumented Latino Students*, 33 Rev. of Higher Educ. 239, 260 (2010).

[34] Erin Dunlop Velez & Laura Horn, *What High Schoolers and Their Parents Know About Public 4-Year Tuition and Fees in Their State*, U.S. Dep't of Educ., Inst. of Educ. Scis. 13 (Oct. 2018), https://nces.ed.gov/pubs2019/2019404.pdf.

enroll.[35] Access to in-state tuition also tends to reduce delays in matriculation, increasing the odds of degree completion and hastening students' access to the financial rewards of higher education, *see infra*, pp. 25–26.[36]

Tuition equity also gives all students a better chance to focus on their studies and to reap the benefits of higher education once enrolled. One analysis found that paying in-state tuition reduces undocumented students' need to work to support full-time tuition and living costs from 35 hours per week to 23.[37] These students' work obligation declines even further, to 14 hours per week, when they have access to state financial assistance that is available to their U.S. citizen peers.[38] Minnesota's tuition equity laws do just this, enabling undocumented students to

---

[35] Brian Freeman & Sandra Wilson, *College Affordability Views and College Enrollment*, U.S. Dep't of Educ., Inst. for Educ. Scis. 2 (Jan. 2022), https://nces.ed.gov/pubs2022/2022057.pdf.

[36] Rajeev Darolia & Stepanie Potochnick, *Educational "When," "Where," and "How" Implications of In-State Resident Tuition Policies for Latino Undocumented Immigrants*, 38 Rev. of Higher Educ. 507, 523, 530 (2015).

[37] Wil del Pilar, *Crushed Dreams and Broken Promises, Supreme Court Edition*, EdTrust (July 2, 2020), https://edtrust.org/blog/crushed-dreams-and-broken-promises-supreme-court-edition.

[38] *Ibid.*

complete their education without delay or crushing debt, putting them on a path toward stability and self-reliance.

#### ii. Higher education improves financial and wellbeing outcomes.

Attaining postsecondary education pays off, positioning students to earn higher salaries and to support themselves and their families long-term. The impact of higher education on economic possibility is clear: the median weekly earnings for those with a high school diploma is $930, whereas the median weekly earnings for those with a bachelor's degree is $1,543, an increase of nearly $32,000 (or 66 percent) per year.[39] Students who earn an associate's degree—and those who complete some college without graduating—earn more than those who receive only a high school diploma.[40]

Even if students do not ultimately attend college, the availability of in-state tuition (and realistic possibility of college attendance) can incentivize high schoolers to remain in school.[41] One study showed an

---

[39] Bureau of Labor Statistics, *Education Pays* (2024), https://www.bls.gov/emp/chart-unemployment-earnings-education.htm.

[40] *Ibid.*

[41] Nunez & Holthaus, *supra* note 29, at 51; Robert Bozick & Trey Miller, *In-State College Tuition Policies for Undocumented Immigrants:*

eight-point reduction in the dropout rate of foreign-born, non-citizen Mexican students—a proxy for undocumented students—after a state adopted an inclusive in-state tuition policy.[42] High school completion alone increases median earnings by nearly $200 per week, from $738 to $930.[43] Further, only 13% of high school graduates live in households in poverty—a figure that lowers to 4% for bachelor's degree holders—compared with 23% of non-graduates.[44]

Beyond improving financial prospects, increasing undocumented students' access to higher education also may promote personal wellbeing outcomes that allow them to thrive and contribute to their communities. People who attain higher levels of education demonstrate higher rates of positive behaviors including: civic engagement, such as volunteering; healthy habits, like exercise and not smoking; and good parenting

---

*Implications for High School Enrollment Among Non-Citizen Mexican Youth*, 33 Population Rsch. & Pol'y Rev. 13, 27–28 (2014).

[42] Stephanie Potochnick, *How States Can Reduce the Dropout Rate for Undocumented Immigrant Youth: The Effects of In-State Resident Tuition Policies*, 45 Soc. Sci. Rsch. 12, 17 (May 2014).

[43] Bureau of Labor Statistics, *supra* note 39.

[44] Matea Pender, et al., *Education Pays 2026: The Benefits of Higher Education for Individuals and Society* 38, Coll. Bd. (2026), https://research.collegeboard.org/media/pdf/education-pays-2026-full-report.pdf.

practices, like preschool enrollment and active engagement with children.[45] These individuals also are well positioned for long-term stability, as higher levels of educational attainment are associated with higher rates of participation in employer-sponsored health insurance and retirement savings plans.[46]

Access and incentives to college attendance allow undocumented students to pursue greater wealth and wellbeing over the course of their adult lives. Tuition equity laws like Minnesota's, therefore, serve Congress' goals of promoting immigrants' self-sufficiency and reliance on their own resources and capabilities.

### III. Minnesota's tuition equity laws are an exercise of traditional state authority that supports the State's public education system, workforce, and economy.

The nature of Minnesota's tuition equity laws—which address the function of the state's public educational institutions—and the goals they serve are further reasons for this Court to reject the United States' preemption argument.

---

[45] *Id.* at 41–45.
[46] *Id.* at 36–37.

### a. Construing Section 1623 to preempt Minnesota's tuition equity laws would intrude on the State's control of its education function.

Because Minnesota's tuition equity laws clearly comply with Section 1623's express command, the district court did not need to resolve whether its application would intrude on traditional state functions, requiring heightened clarity of Congress's preemptive intent. Add.14 n.8; App.14 n.8; R.Doc.42, at 14 n.8. Such an analysis, however, would provide another reason to reject preemption: to the extent there is any ambiguity in Section 1623's meaning, the Court must construe it to "disfavor[] preemption" because the law implicates states' "historic police powers." *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1176 (8th Cir. 2023).

Section 1623, which regulates eligibility for "any postsecondary education benefit," legislates "in a field traditionally occupied by the States." *Ibid*. It is well established that "education is perhaps the most important function" of state government. *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Elementary and secondary schooling—which every state provides to minor children, regardless of immigration status—is "a principal instrument in awakening the child to cultural values, in

preparing him for later professional training, and in helping him to adjust normally to his environment." *Ibid.* Naturally, "[h]igher education," as well, "is an area of quintessential state concern and a traditional state governmental function." *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 265 (4th Cir. 2005).

Minnesota's tuition equity laws serve important priorities for the state education system. The State has made an "investment" in higher education to pursue its objectives of: "promot[ing] democratic values and enhanc[ing] Minnesota's quality of life by developing understanding and appreciation of a free and diverse society"; "providing an opportunity for all Minnesotans, regardless of personal circumstances, to participate in higher education"; and "enhanc[ing] the economy by assisting the state in being competitive in the world market, and . . . prepar[ing] a highly skilled and adaptable workforce that meets Minnesota's opportunities and needs." Minn. Stat. § 135A.011. In keeping with this vision of the education system as a driver of a thriving society and economy, the legislature set a goal of increasing the proportion of 25-to-44-year-olds with postsecondary degrees or technical credentials to "at least 70 percent" by 2025. Minn. Stat. § 135A.012.

The Prosperity Act's expansion of affordable higher education access to undocumented students complements the State's program of education investments to promote opportunity for all in a society that is free, diverse, and economically prosperous. As the Prosperity Act's author in the State Senate explained, the law aimed to enable undocumented graduates of Minnesota's high schools to share in the dream of attending college and becoming "productive members of our state."[47] The author of a parallel bill in the Minnesota State House of Representatives explained that it expanded access to higher education "regardless of personal circumstances," which was necessary "if we want Minnesota to stay economically competitive."[48]

Thus, Minnesota's tuition equity laws fall squarely within the state's traditional authority, which Section 1623 should not be construed to disrupt.

**b. Tuition equity is an investment in the State's education system.**

Underscoring these federalism concerns, tuition equity policies like Minnesota's may in fact bring substantial benefits to a state's K–12 and

[47] Friedrich, *supra* note 15.
[48] Minn. House of Rep., *supra* note 26.

higher education institutions, including improvements in student engagement, enrollment, and the quality of the academic experience.

First, the availability of in-state tuition can boost enrollment and engagement in K–12 schools. As explained above, *supra* pp. 25–26, expanding access to in-state tuition has been shown to reduce the dropout rate among undocumented students. Indeed, students' perception of whether college is affordable can impact their investment in school and willingness to attend—for better if students believe they can afford college, for worse if not.[49] Thus, tuition equity laws that make college an attainable goal for undocumented students not only may increase the likelihood of their ongoing attendance but also may promote positive classroom experiences.

Next, expanded access to in-state tuition and financial assistance naturally may increase enrollment in a state's higher education institutions. *See supra* pp. 21–24. The enrollment boost may be particularly strong at two-year institutions, but also significant at four-year institutions.[50] This is meaningful for a state like Minnesota, where

[49] *See* Potochnick, *supra* note 42, at 12, 17; Bozick & Miller, *supra* note 41, at 27–28; Nunez & Holthaus, *supra* note 29, at 51.

[50] Darolia & Potochnick, *supra* note 36, at 530–31.

strengthening postsecondary enrollment is a legislative priority. Minn. Stat. § 135A.012.

Notably, state policies offering in-state tuition to undocumented students may come at a "negligible" cost, as the students newly enrolling at a reduced price otherwise might not enroll at all.[51] In Minnesota, the passage of the Prosperity Act only was projected to expand eligibility for in-state tuition and some grants by 750 students, and the state's universities anticipated being able to absorb the costs.[52] Notably, improvement in undocumented students' enrollment due to the availability of in-state tuition and state financial assistance does not come at the expense of other groups, who have not been shown to enroll at a lower rate once undocumented students' enrollment increases.[53] In other words, tuition equity can benefit everyone.

---

[51] Nat'l Immigr. L. Ctr, *Basic Facts About In-State Tuition for Undocumented Immigrant Students* 2 (June 2, 2026), https://media.nilc.org/2025/09/instate-tuition-basicfacts-2026-06-02.pdf.

[52] Friedrich, *supra* note 15.

[53] Neeraj Kaushal, *In-State Tuition for the Undocumented: Education Effects on Mexican Young Adults*, 27 J. of Pol'y Analysis & Mgmt. 771, 789 (2008); Lisa Dickson, et al., *The Education and Employment Effects of DACA, In-State Tuition, and Financial Aid for Undocumented Students* 10–12 (Inst. of Lab. Econ., IZA Discussion Paper No. 11109, 2017); *see also* Amuedo-Dorantes & Sparber, *supra* note 33, at 15.

Finally, tuition equity may enhance the quality of the postsecondary education experience that a state offers. Maintaining access to in-state tuition for undocumented students encourages their pursuit of education and thus promotes a more diverse student body. Exposure to diversity can improve academic achievement, intellectual engagement, cognitive skills, and civic engagement, and can help students prepare for participation in a diverse workforce and society.[54] These benefits accrue to all enrollees.

**c. Tuition equity is an investment in the State's workforce and economy.**

Tuition equity laws also serve Minnesota's policy of higher education investment as a pathway to a strong state workforce and economy. Affordable tuition can encourage graduates of the state's high schools to matriculate at the state's higher education institutions and pursue careers in Minnesota.

[54] *See, e.g.*, Katherine W. Phillips, *How Diversity Works*, 311 Sci. Am. 42, 44–46 (Oct. 2014); Deborah Son Holoien, *Do Differences Make a Difference? The Effects of Diversity on Learning, Intergroup Outcomes, and Civic Engagement* 4–8, 14–15 (Sept. 2013), https://inclusive.princeton.edu/sites/g/files/toruqf7151/files/pu-report-diversity-outcomes.pdf; Patricia Gurin, et al., *Diversity and Higher Education: Theory and Impact on Educational Outcomes*, 72 Harv. Educ. Rev. 330, 346–58 (2002).

In fact, when states fail to provide all of their high school graduates with "access to their higher education systems at in-state tuition rates," they "miss an opportunity to get the most" from the investments they already have made in those students.[55] In Minnesota, reimposing an economic barrier to undocumented students' access to higher education "may lead to unrealized potential" that reduces "the production of doctors, teachers, engineers, as well as other careers requiring advanced degrees."[56]

Encouraging high school graduates to pursue higher education in state is particularly valuable for building the workforce in essential professions like education. There is a nationwide teacher shortage, *see supra* p. 11, from which Minnesota is no exception. Eighty-four percent of Minnesota school districts in a statewide survey have reported that they are affected by teacher shortages.[57] Approximately 7,000 K–12

---

[55] Erica Williams, et al., *Inclusive Approach to Immigrants Who Are Undocumented Can Help Families and States Prosper*, Ctr. on Budget & Pol'y Priorities (Dec. 19, 2019), https://www.cbpp.org/research/state-budget-and-tax/inclusive-approach-to-immigrants-who-are-undocumented-can-help.

[56] Nunez & Holthaus, *supra* note 29, at 54.

[57] Minn. Professional Educator Licensing & Standards Bd., *2023 Biennial Report: Supply & Demand of Teachers in Minn*esota 4, https://mn.gov/pelsb/assets/Supply%20and%20Demand%202023_tcm11

teaching positions in Minnesota either were unfilled or filled by staff members who were not fully certified for their assignments in the 2024–2025 school year.[58] Tuition equity may help to close that gap by ensuring that all Minnesota high school graduates, including those who are undocumented, can pursue the postsecondary education they need to enter the teaching profession. Moreover, undocumented educators may bring "unique advantages" to their schools, including bilingualism, diversity, and distinctive perspectives.[59] The same effect may be felt in other essential fields, like healthcare, where college-educated workers are crucial to supporting the wellbeing of the state's populace.

Having a robust, college-educated workforce ensures that essential roles are filled and promotes greater prosperity overall by increasing

---

13-571491.pdf (describing perception of shortage); Minn. Professional Educator Licensing & Standards Bd., *The 2025 Supply & Demand of Teachers in Minnesota: a Biennial Report* 11, https://mn.gov/pelsb/assets/2025%20Supply%20and%20Demand%20Report.post2_tcm1113-713735.pdf (describing perception of shortage as unchanged since 2023).

[58] Tan, et al., *supra* note 11.

[59] Jonathan Zabala, *Diversifying the U.S. Teaching Force: Pathways for Undocumented Teachers*, The Century Found. (Oct. 18, 2023), https://tcf.org/content/commentary/diversifying-the-u-s-teaching-force-pathways-for-undocumented-teachers.

productivity and wages.[60] Further, college graduates' increased earnings "mean more money circulating through local stores and businesses and more public revenue for state investments and services that benefit everyone, like safe roads and public schools."[61]

The sum of the matter is that Minnesota's tuition equity laws promote important state interests, with which this Court should not construe Section 1623 to interfere.

---

[60] *See* Williams, et al., *supra* note 55; Noah Berger & Peter Fisher, *A Well-Educated Workforce Is Key to State Prosperity*, Econ. Pol'y Inst. (Aug. 22, 2013), https://www.epi.org/publication/states-education-productivity-growth-foundations.

[61] Williams, et al., *supra* note 55.

**CONCLUSION**

For these reasons, this court should affirm the district court's dismissal of the United States' complaint.

Respectfully submitted,

/s/ Katherine E. Lamm
Alice O'Brien
Katherine E. Lamm
Lubna A. Alam
Stacy Hickox
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036
(202) 822-7067
klamm@nea.org

*Counsel for Amici Curiae*

September 1, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION AND TYPEFACE AND TYPESTYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,484 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Century Schoolbook 14-point font.

/s/ Katherine E. Lamm

September 1, 2026

## CERTIFICATE OF COMPLIANCE WITH EIGHTH CIRCUIT RULE 28A(H)

Pursuant to this Court's Rule 28A(h), I hereby certify that the electronic version of this document has been scanned for viruses and is virus-free.

/s/ Katherine E. Lamm

September 1, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Katherine E. Lamm

September 1, 2026